UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :

UNITED STATES OF AMERICA          :      S2 15 Cr. 845 (SHS)

                                                              :

              - v. -                      :

                                                              :

ALI HAMILTON, et al.,               :

                                                                :

                         Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## GOVERNMENT'S MOTIONS *IN LIMINE*

<br><br>

                                       GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York
                                        One St. Andrew's Plaza
                                        New York, New York 10007

<br>

Maurene Comey
Karin Portlock
Jacob Warren
Assistant United States Attorneys
      -Of Counsel-

# **Table of Contents**

I.  Background ............................................................................................................... 1

II.  The Enterprise ........................................................................................................ 3

III.  Evidence Regarding Certain Defendants' Prior Incarceration is Admissible ..................... 4

   A.  Facts ............................................................................................................. 4

   B.  Applicable Law ............................................................................................. 9

   C.  Discussion ................................................................................................... 12

IV.  Evidence Regarding Attempts to Intimidate a Witness Is Admissible ............................ 14

   A.  Facts ........................................................................................................... 14

   B.  Applicable Law ........................................................................................... 14

   C.  Discussion ................................................................................................... 15

V.  The Court Should Preclude Cross Examination of Certain of the Government's Witnesses on Limited Topics Not Relevant to Their Credibility ................................................................. 15

   A.  Background .................................................................................................. 15

   B.  Applicable Law ........................................................................................... 19

   C.  Discussion ................................................................................................... 22

     1.  CW-1 Child Endangerment; Domestic Disputes Involving CW-2, CW-3, CW-4, and CW-5; and CW-3's Sexual Harassment Conviction ......................................................... 22

     2.  Detective-1 and CW-1 ............................................................................. 23

VI.  Conclusion ............................................................................................................ 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

UNITED STATES OF AMERICA             :       S2 15 Cr. 854 (SHS)
                                        :

               - v. -                         :
                                        :

ALI HAMILTON, et al.,                     :
                                        :

                       Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GOVERNMENT'S MOTIONS *IN LIMINE*

      The Government respectfully submits this memorandum of law in support of its motions *in limine* to admit at trial evidence of certain defendants' prior incarceration, to admit evidence regarding an attempt to intimidate a witness in this case, and to preclude cross-examination of certain Government witnesses on limited subjects.[1]

## I.      Background

      Ali Hamilton, a/k/a "Smiley," Lessage Jean Baptiste, a/k/a "Usher," David Buckhanon, a/k/a "Mace," Jammal Lindo, a/k/a "Poppy," a/k/a "Ghost," Jaleel Baron, a/k/a "Jah," a/k/a "Youngin," Maurice Simmons, a/k/a "Momoneybagz," and Kyle Mullings, a/k/a "Kase," with participating in and associating with a violent organization known as the "Beach Avenue Crew," also known as "Beach," the members of which distributed narcotics and committed a variety of

---

[1] The Government is continuing to prepare for trial both by preparing witnesses and by investigating additional evidence regarding the charges against the remaining defendants in this case. To the extent these continued preparations raise additional issues requiring the Court's attention in advance of trial, the Government will promptly alert the Court in a supplemental submission. In addition, the Government is currently negotiating with defense counsel for Hamilton, Jean Baptiste, Lindo, and Baron, who are scheduled to proceed to trial on September 24, 2018 (the "First Trial Defendants"), regarding the terms of a protective order limiting the dissemination of Jenks Act and *Giglio* material for its witnesses and expects to present a proposed order for the Court's consideration in advance of trial.

violent acts – including assault and attempted murder – primarily in and around the Bronx, New York, from at least in or about 2009 up to and including in or about February 2017 ("Beach" or the "Enterprise"). The charges arise from shootings, assaults, and narcotics trafficking committed by members and associates of the Enterprise in furtherance of the Enterprise's objectives, which included maintaining the reputation of the Enterprise and its members and protecting the Enterprise's monopoly on the distribution of narcotics in the areas of the Bronx that its members controlled.

Hamilton, Jean Baptiste, Buckhanon, Lindo, Baron, Simmons, and Mullings are charged with participating in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) in Count One. Hamilton is charged with assault and attempted murder in aid of the Enterprise's racketeering activity, in violation of 18 U.S.C. § 1959(a)(5) in Count Two. Lindo, Jean Baptiste, and Baron are charged with assault and attempted murder in aid of the Enterprise's racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) and 2 in Count Three. Hamilton, Jean Baptiste, Buckhanon, Lindo, Baron, Simmons, and Mullings are charged with participating in a narcotics conspiracy, in violation of 21 U.S.C. § 846 in Count Four, and with using, possessing, and discharging firearms – and aiding and abetting the same – in furtherance of the racketeering conspiracy charged in Count One and the narcotics conspiracy charged in Count Five, in violation of 18 U.S.C. §§ 924(c) and 2. Hamilton is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) in Count Six.[2]

---

[2] The Government has informed counsel for the First Trial Defendants that it intends to file a superseding indictment within the next three weeks, which will add allegations regarding the defendants' distribution of heroin and marijuana and which will restructure the firearms counts, tying separate counts to the shootings charged in Counts Two and Three and to the narcotics conspiracy charged in Count Four. None of these new charges will give rise to new discovery, nor will they substantially alter the evidence offered at trial.

## II.    The Enterprise

Beach is a criminal organization whose members and associates engaged in, among other activities, narcotics trafficking, attempted murder, and assault with dangerous weapons.  The trial testimony will establish that Beach was a local, street-level gang that operated in and around the vicinity of Beach Avenue in the Bronx, New York.

From at least in or about 2009, members and associates of Beach regularly distributed cocaine base, or "crack," as well as heroin and marijuana, in an around the area of Beach Avenue between East Tremont Avenue and the Cross Bronx Expressway.  Beach controlled drug sales within this area by prohibiting and preventing non-members, outsiders, and rival drug dealers from distributing narcotics in the area controlled by the Enterprise.

Of particular significance, at various points between approximately 2009 to 2017, Beach became engaged in violent disputes with other drug dealers and crews in the area.  This included intermittent rivalries with members of a nearby gang from Taylor Avenue, known as "Taylor" or "Bugatti Boys," and with members of another nearby gang from Leland Avenue, known as "Leland" or "Paper Ave."  The close proximity between Beach Avenue, Taylor Avenue, and Leland Avenue – the three streets run parallel to each other and are each separated by one block – contributed to the bouts of violent rivalry among the three gangs.  Throughout those disputes, members of Beach, Taylor, and Leland committed shootings and other acts of violence to protect their respective territories, to protect their narcotics and narcotics proceeds, and to intimidate rival gang members.

In or around 2008 and 2009, members of the Beach Avenue Crew sold crack cocaine with members of the Taylor Avenue Crew and shared territory with members of Taylor.  Eventually, however, certain Beach members became dissatisfied with their arrangement with Taylor and began obtaining crack cocaine from suppliers outside of Taylor and selling outside of

their scheduled shifts on Taylor.  This behavior led to a rift between certain members of Beach and Taylor, which resulted in a cycle of retaliatory acts of violence by members of both crews. This conflict largely marked the beginning of the Beach Avenue Crew, leading its older member and leader, Lessage Jean Baptiste, to break away from the Taylor Avenue Crew and begin supplying his own crew on Beach Avenue.

At some point a few years after the split, the Beach Avenue Crew eventually reached a tentative truce with the Taylor Avenue Crew.  Although Taylor and Leland were engaged in a violent rivalry with each other over several of these years, Beach did not engage in conflict with Leland until in or around 2014 when a member of the Leland Avenue Crew shot a member of the Beach Avenue Crew while aiming at a member of the Taylor Avenue Crew.  This incident resulted in heightened tensions between Beach and Leland and led to additional acts of violence between the two gangs.  In addition to rivalries with these neighboring crews, Beach members also reacted with threats and even violence when outsiders attempted to sell drugs in their territory.

Beach members explicitly acknowledged their group affiliation by, among other things, creating and placing on social media sites such as Facebook, Instagram, and YouTube, photographs and rap videos that celebrated the Enterprise's illegal activities.  The postings included references to drug sales, gun possession, shootings, "BBM" or "Beach By Mansion," and "Beach" more generally.

### III.  Evidence Regarding Certain Defendants' Prior Incarceration is Admissible

#### A.  <u>Facts</u>

The evidence at trial will demonstrate that certain defendants were incarcerated at various times between in or about 2009 and the present.  As discussed herein, evidence of these defendants' incarceration will be introduced for two limited purposes: (1) to explain some of

these defendants' absence from Beach Avenue for their periods of incarceration; and (2) to provide context for certain conversations and recorded phone calls in which some of these defendants participated while they were incarcerated.

In particular, Government seeks to admit evidence regarding the following periods of incarceration:

- <u>Lessage Jean Baptiste</u>.  As described in the Government's enterprise letter of July 23, 2018 (the "Enterprise Letter"), Jean Baptiste was arrested on narcotics conspiracy charges on May 25, 2010 and ultimately pled guilty to criminal possession of a controlled substance in the third degree.  As a result of this arrest and conviction, Jean Baptiste was incarcerated from in or about May 2010 until in or about October 2011.

- <u>Jammal Lindo</u>.  As described in the Enterprise Letter, Lindo was arrested on narcotics conspiracy charges on May 24, 2010 and ultimately pled guilty to criminal sale of a controlled substance in the third degree.  As a result of this arrest and conviction, Lindo was incarcerated from in or about May 2010 until in or about June 2011.

- <u>David Buckhanon</u>.  As described in the Enterprise Letter, Buckhanon was arrested on narcotics charges on October 18, 2010 and ultimately pled guilty to criminal possession of a controlled substance in the seventh degree.  As a result of this arrest and conviction, Buckhanon was incarcerated for approximately one year from 2010 through 2011.

- <u>Jaleel Baron</u>.  Baron was arrested in or about July 2009 and remanded without bail until in or about July 2010.

- <u>Ali Hamilton</u>.  Hamilton was arrested in or about June 2015 on state charges for the May 5, 2015 shooting and remained detained for several days into July 2015. Those charges were eventually dismissed by the Bronx District Attorney's Office. Subsequently, Hamilton was arrested for gun possession on or about October 31, 2015 and has remained in custody since that date.  Hamilton was also convicted on October 22, 2015 of criminal sale of a controlled substance in the third degree.

Evidence that Hamilton, Jean Baptiste, Lindo, Baron, and Buckhanon were previously convicted of narcotics offenses will be offered as proof of their participation in the charged racketeering and narcotics conspiracies, as is more fully explained in the Enterprise Letter.  As set forth in the Enterprise Letter, this evidence of prior bad acts is not offered as propensity evidence and therefore does not run afoul of Rule 404.  Both pieces of evidence—the fact of their incarceration and the nature of their underlying convictions—are relevant, and are more probative than prejudicial, and therefore should not be excluded pursuant to Rule 403.  The Government intends to offer this evidence in the form of certified convictions and transcripts of guilty plea allocutions.

Evidence of all five of these defendants' prior incarceration will also come in the form of witness testimony.  For example, multiple cooperating witnesses are expected to testify that certain Beach Avenue Crew members, including Jean Baptiste, Lindo, Buckhanon, Baron, and Hamilton were not in Beach territory at certain points during the period of the racketeering and narcotics conspiracies charged in the indictment because they were incarcerated.  Some of these cooperating witness accounts will describe their observations of these defendants' criminal activities before the defendants were imprisoned and after they returned home from incarceration.

In addition, at least some cooperating witnesses are expected to testify that they had conversations with certain defendants while incarcerated on the current charges in which they admitted to certain criminal activities. For example, at least one cooperating witness is expected to testify that Hamilton admitted to possessing a gun and committing the May 5, 2015 shooting charged in the Indictment. Additionally, at least one cooperating witness is expected to testify that Buckhannon admitted to selling heroin.

Additionally, the Government anticipates offering into evidence certain telephone calls that Hamilton and Jean Baptiste made during his various times in jail and prison.[3] Among other things, on at least one such call, Hamilton discussed with Lindo both the May 5, 2015 shooting and assaulting Christian McKnight, a member of the Leland Avenue Crew. During that call, Hamilton told Lindo, among other things, that Hamilton assumed no one would testify in grand jury or otherwise provide a statement to the police about the May 5, 2015 shooting. Hamilton also told Lindo: "I'm happy I beat that PD though, yall niggas would have never seen me," apparently referencing the dismissal of state charges for the May 5, 2015 shooting. Hamilton also told Lindo that Hamilton "knocked this nigga Spike the fuck out . . . I knocked that nigga out for me and I stomped that niggas mouth for you though, you heard"—both Hamilton and Lindo then laughed about the assault.

In a separate call in June 2015, Hamilton also talked with Baron about the May 5, 2016 shooting. On that call, Hamilton told Baron, among other things: "I just beat the PD, they

---

[3] The Government also recently received a production of calls for some of the defendants from the Bureau of Prisons. The Government is preparing to produce those in discovery and is reviewing the calls to determine whether it will offer any of them at trial. The Government may also offer into evidence emails that certain defendants sent and received while incarcerated on the current charge.

dropped them charges . . . niggas didn't want to . . . on the stand and all," apparently referencing the dismissal of state charges for the May 5, 2015 shooting. Hamilton then told Baron: "I just knocked this nigga Spike out." Baron responded: "OG Blood . . . OG Blood." Hamilton then told Baron: "I knocked this nigga the fuck out bro, stomped this nigga up . . . ." Hamilton and Baron then engaged in a conversation regarding the details of the assault. Hamilton further told Baron: "If I run into that nigga again, I'm going to finish him."

In another call in June 2015 Hamilton again discussed the May 5, 2015 shooting. Hamilton stated, among other things, that: "I just beat the PD"—and laughed about the dismissal of state charges for the May 5, 2015 shooting. Hamilton further stated: "I can't be over there no more now that they dropped that shit." Hamilton also referenced the assault of Christian McKnight, stating, "I already got a birthday gift in here you heard, I knocked one of the Ops out . . . stomped this niggas head in . . . ."

As another example, during a separate call in June 2015, Hamilton asked his girlfriend how she would feel if instead of bailing her out, Hamilton used the money for a "re-up." The Government intends to offer evidence at trial that the term "re-up" is used by drug traffickers as a reference to purchasing more narcotics to then re-sell.

Similarly, on multiple phone calls in or around April 2017, Jean Baptiste discussed individuals he believed were "telling," or cooperating with law enforcement against members of the Beach Avenue Crew. Of particular note, Jean Baptiste referenced particular members of the Taylor Avenue Crew by their street names as potential witnesses against him. The context of these conversations suggest that Jean Baptiste believes these individuals have information regarding his and his co-defendants' criminal activities to "tell" law enforcement. Jean Baptiste also referenced having a "side hustle" in an apparent reference to working a legitimate job on the

side of his regular narcotics distribution activity.

**B.  <u>Applicable Law</u>**

"Direct evidence of the crimes charged in the indictment is considered relevant and admissible without reference to Federal Rule of Evidence 404(b)."  *United States v. Kahale*, 789 F.Supp.2d 359, 381 (E.D.N.Y. 2009) (*citing United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)).  When determining whether Rule 404(b) governs the admissibility of particular evidence, the Second Circuit has cautioned that direct evidence of a crime is not limited to "that which directly establishes an element of the crime."  *United States v. Gonzalez*, 110 F.3d 936, 941-42 (2d Cir. 1997).  In keeping with that principle, "other acts" evidence can constitute direct evidence and is therefore not subject to analysis under Rule 404(b).  *See, e.g.*, *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *accord United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007).  It is well established, for example, that "other acts" evidence is admissible as direct evidence of the crimes charged and not considered Rule 404(b) evidence if it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is necessary to complete the story of the crime on trial."  *Carboni*, 204 F.3d at 44 (internal quotation marks omitted); *see also United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (*citing Carboni*, 204 F.3d at 44).  "In such circumstances, the uncharged crime evidence is . . . appropriately treated as part of the very act charged, or, at least, proof of that act."  *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (internal quotations omitted*); see also United States v. Affronti*, 113 F.3d 1230, at *2 (2d Cir. May 13, 1997) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather it is part of the very act charged.").

"Evidence is 'relevant' if it has 'any tendency' to prove or disprove a fact of consequence in the trial." *United States v. Wong*, 40 F.3d 1347, 1378 (2d Cir. 1994) (quoting Fed. R. Evid. 401). The Second Circuit has set forth a "very low standard for relevance." *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008); *see also United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry."). In general, "relevant evidence is admissible," but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 402, 403. However, evidence is not excludable simply because it is "prejudicial." "To be sure, all evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him. What 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986). Moreover, Rule 403 does not require the exclusion of evidence other bad acts which "involve[d] conduct [no] more sensational or disturbing than the crimes with which [the defendant] was charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006).

Furthermore, evidence of "similar acts" is admissible under Rules 404(b) and 403 of the Federal Rules of Evidence if such evidence is relevant to some issue at trial other than the defendant's character, and if the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice. *See, e.g., Huddleston v. United States*, 485 U.S. 681, 685-86

(1988); *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (per curiam). It is well settled that "other acts" evidence is admissible under Rule 404(b) so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) ("Other-crime evidence is admissible for any other relevant purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that the probative value of this relevant purpose is not substantially outweighed by any unfair prejudice" (internal quotation marks and citations omitted)), *cert. denied*, 549 U.S. 980 (2006); *see also United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity").

The Second Circuit takes an "inclusionary" approach to the admission of other act evidence, under which "evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" *Paulino*, 445 F.3d at 221 (quoting *United States* v. *Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992)). For example, the Second Circuit has routinely approved the admission of prior misconduct evidence with respect to the issues of a defendant's knowledge, intent, and absence of mistake, where those issues are in dispute. *See, e.g., United States* v. *Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1995); *United States v. Oshatz*, 912 F.2d 534, 542-43 (2d Cir. 1990).

A District Court's ruling on other acts evidence may be reversed only for abuse of discretion, and "[t]o find such an abuse [the Court of Appeals] must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (citing *Pitre*, 960 F.2d at 1119).

## C. **Discussion**

The proffered evidence is relevant and direct proof of the charged crimes and is therefore admissible. *See* Fed. R. Evid. 401. As set forth more fully in the Enterprise Letter, the defendants' prior arrests and convictions for narcotics-related offenses are admissible as direct evidence of the charged racketeering and narcotics conspiracies. The jail telephone calls and "jailhouse confessions" both establish these defendants' membership in the charged Enterprise and provide proof of their commission of certain of the charged offenses.

Likewise, the explanation for certain defendants' absences from Beach Avenue is relevant because it explains why these defendants were not committing crimes with other members of Beach during that time period. *See United States* v. *Price*, 05 Cr. 492 (NGG), 2009 WL 973370, at *1 (E.D.N.Y. Apr. 10, 2009) (noting that periods of prior incarceration were admissible in a racketeering case because the evidence was inextricably intertwined with the evidence regarding the charged offense and is necessary to complete the story of the crime on trial).

Because the defendants' prior and current incarceration in these circumstances is inextricably intertwined with evidence of the charged offenses, and is admissible as direct evidence of those offenses, the only remaining issue is whether the probative value of such evidence is outweighed by the risk of unfair prejudice. Under Federal Rule of Evidence 403, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980); *see also United States v. Brand*, 467 F.3d 179, 195 n.1 (2d Cir. 2006) (same).

The testimony and evidence regarding these matters will be brief and not more

sensational or inflammatory than the evidence of the charged crimes, which include racketeering, narcotics, firearms, assault, and attempted murder charges. Indeed, any prejudice to the defendants arising from evidence of their prior and current incarceration and/or their prior narcotics conduct would be minimal in comparison to the crimes with which they are charged, and, in any case, would not be unfair because it would not tend to prove any fact other than those for which it was being offered. *See Pitre*, 960 F.2d at 1120 (danger of unfair prejudice lessened if "other acts" evidence involves crime of equal or less seriousness than the charged crimes); *Roldan Zapata*, 916 F.2d at 804 (same); *cf. Rosario* v. *Ercole*, 582 F. Supp. 2d 541, 598-99 (S.D.N.Y. 2008) (upholding, in habeas context, admission of trial evidence of the defendant's incarceration, which rebutted the defendant's testimony, where the trial judge "issued a limiting instruction to the jurors that they were not to consider evidence of [the defendant]'s incarceration as evidence of a propensity to commit crimes"). It cannot fairly be said—in the context of a case in which the defendants are charged with racketeering, narcotics, and firearms discharge offenses—that there is a "substantial risk" that the jury would evaluate the "other crime" evidence on an irrational or emotional basis, rather than for the purpose that it will be used.

Finally, admission of evidence of prior incarceration would not trigger the rule set forth in *Estelle v. Williams*, 425 U.S. 501 (1976), and extended to federal courts in *United States v. Hurtado*, 47 F.3d 577 (2d Cir. 1995). In *Estelle*, the Supreme Court found that the state's compulsion of a defendant to wear identifiable prison garb at trial violated the defendant's rights to a fair trial and the presumption of innocence. This decision rested in part, however, on the conclusion that "compelling an accused to wear jail clothing furthers no essential state policy." *Estelle*, 425 U.S. at 505. Here, there would be no disruption of courtroom decorum or other implication of any defendant's guilt of the charged offenses. The mere fact of prior and current

incarceration does not, by itself, infringe on a defendant's right to a fair trial or the presumption of innocence—if it did, for example, jailhouse confessions and recordings of prison calls would always be inadmissible, as would much other evidence routinely admitted pursuant to Federal Rules of Evidence 404(b) and 609(a).

## IV. Evidence Regarding Attempts to Intimidate a Witness Is Admissible

The Court should admit at trial threats made by Ali Hamilton to a cooperating witness ("CW-1") in or about 2015 as probative of the defendant's consciousness of guilt.

### A. <u>Facts</u>

Prior to 2015, CW-1 was involved in the distribution of crack cocaine with Hamilton and other members of the Beach Avenue Crew. CW-1 also observed Hamilton in possession of a firearm and received crack cocaine from Hamilton for personal use and redistribution. In or about 2015, CW-1 saw Hamilton in the Bronx County Court when Hamilton was present for a court appearance regarding pending charges. During that interaction, Hamilton attempted to intimidate CW-1 and threatened CW-1 in order to deter CW-1 from informing law enforcement about Hamilton's involvement in criminal activities. Specifically, Hamilton stated, in sum and substance "you better keep your mouth shut, I know where your daughter goes to school."

### B. <u>Applicable Law</u>

"Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt." *United States v. Perez*, 387 F.3d 201, 209 (2d Cir.2004). "Such evidence is admissible [under Rule 404(b)] if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." *Id.* at 209 (citing *United States v.*

*Mickens*, 926 F.2d 1323, 1328–29 (2d Cir. 1991). Notably, the Second Circuit "has long held an inclusionary approach" to evidence offered under Rule 404(b). *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006).

### C. <u>Discussion</u>

Hamilton's statements to CW-1 should be admitted as consciousness of guilt evidence. His attempts to threaten and intimidate CW-1 reflect Hamilton's awareness that CW-1 could provide information regarding his narcotics distribution activity and gun possession to law enforcement. Witness intimidation, generally, is highly probative of consciousness of guilt, *see United States v. Mickens*, 926 F.2d 1323, 1329 (2d Cir.1991) ("an effort to intimidate a key prosecution witness was probative of [the defendant's] state of mind"), and is all the more probative when the threat is made in the context of a court appearance for the very criminal conduct about which the witness has knowledge. These particular threats should be admitted at trial.

### V. The Court Should Preclude Cross Examination of Certain of the Government's Witnesses on Limited Topics Not Relevant to Their Credibility.

The Government respectfully moves *in limine* for a ruling precluding the defense from cross-examining Government witnesses regarding certain matters. As set forth below, the subjects as to which the Government seeks to preclude cross-examination do not bear on the witnesses' credibility, are collateral to the issues relevant at trial, have little or no probative value, and are unfairly prejudicial.

### A. <u>Background</u>

<u>CW-1</u>. As referenced above, CW-1 is expected to testify regarding, among other things, CW-1's personal observation of Beach Avenue Crew members distributing narcotics and possessing firearms. CW-1 is expected to testify that multiple members of the Beach Avenue

Crew provided CW-1 with crack cocaine for personal use and for redistribution. The Government seeks to preclude cross-examination regarding the following subjects:

- In the 1980s and 1990s, CW-1 engaged in acts of prostitution in exchange for drugs and money.

- In 1999, CW-1 was arrested for reckless endangerment after CW-1 left CW-1's young child with a friend so that CW-1 could attend a doctor's appointment. The friend took the child to a police precinct. CW-1 lost custody of CW-1's son for approximately seven months as a result.

CW-2. One of the cooperating witnesses ("CW-2") is expected to testify regarding, among other things, CW-2's participation in the Leland Avenue Crew and the violent back-and-forth rivalry among Taylor, Leland, and Beach. CW-2's anticipated testimony also includes information about the defendants' membership in the Beach Avenue Crew, narcotics distribution activity, acts of violence, and firearms possession. The Government seeks to preclude cross-examination regarding the following subject:

- CW-2 has been in a long-term relationship with CW-2's girlfriend, who has at times been physically abusive towards CW-2. During one altercation, CW-2 picked up this girlfriend and shook her, leaving bruises. In addition, CW-2's girlfriend has called the police on CW-2 when CW-2 refused to leave their apartment. CW-2 has never been arrested in connection with any of these incidents.

CW-3. One of the cooperating witnesses ("CW-3") is expected to testify regarding, among other things, CW-3's participation in the Taylor Avenue Crew and the violent back-and-forth rivalry among Taylor, Leland, and Beach. CW-3's anticipated testimony also includes information about the defendants' membership in the Beach Avenue Crew, narcotics distribution

activity, acts of violence, and firearms possession.  The Government seeks to preclude cross-examination regarding the following subjects:

- In or about 2004, when CW-3 was approximately 12 or 13 years old, CW-3 was sexually intimate with a girl of the same age.  The girl's mother pressed charges.  Initially, CW-3 received a desk appearance ticket.  Thereafter, CW-3 pled guilty to sexual harassment and was placed on probation.  While CW-3 was on probation, CW-3 was rearrested for two other offenses, and ultimately received a sentence of incarceration of approximately 18 months, which covered all three cases.

- In or about 2014, in a domestic dispute, CW-3 and a girlfriend got in a fight in which both hit each other.  The girlfriend pressed charges, but they were dropped.  She has called the police and reported that CW-3 hit her (although CW-3 denies these allegations) and then dropped the charges.  CW-3 has also grabbed multiple girlfriends, including around the neck, and thrown them down.  CW-3 has been arrested several times in connection with these domestic disputes but has never been convicted.

CW-4.  One of the cooperating witnesses ("CW-4") is expected to testify regarding, among other things, CW-4's own narcotics distribution activity in the Beach and Taylor areas.  CW-4's anticipated testimony also includes information about the defendants' membership in the Beach Avenue Crew, narcotics distribution activity, acts of violence, and firearms possession.  The Government seeks to preclude cross-examination regarding the following subject:

- CW-4 has been arrested on multiple occasions for charges related to domestic violence.  First, in or about October of 2011, CW-4 was fighting with a girlfriend ("Female-1"), who stabbed CW-4 in the hand during the fight.  Both CW-4 and

Female-1 were arrested and charged with assault. Both parties declined to cooperate in the prosecution of the case, and the charges were dismissed against both. CW-4 has admitted to the Government to approximately five additional instances in which CW-4 and Female-1 fought and further reported that during these fights CW-4 smacked, punched, and choked Female-1. CW-4 has indicated that neither CW-4 nor Female-1 was ever hospitalized or received treatment for any injuries. In or about January of 2012, CW-4 was arrested for violating an order of protection that Female-1 had against him. She alleged that CW-4 had choked her, although CW-4 states that at this point CW-4 and Female-1 were separated and this particular choking incident did not, in fact, occur. The case was ultimately dismissed and sealed.

CW-5. One of the cooperating witnesses ("CW-5") is expected to testify regarding, among other things, CW-5's participation in the Taylor Avenue Crew and the violent back-and-forth rivalry among Taylor, Leland, and Beach. CW-5's anticipated testimony also includes information about the defendants' membership in the Beach Avenue Crew, narcotics distribution activity, acts of violence, and firearms possession. The Government seeks to preclude cross-examination regarding the following subject:

- On at least one occasions, CW-5 pushed a domestic partner during a fight.

Detective-1. Detective-1, a detective in the New York City Police Department ("NYPD"), is one of the case detectives for the overall investigation. He may be called to testify regarding, among other things, social media evidence and phone evidence recovered during the course of this investigation. The Government seeks to preclude cross-examination regarding the following subject:

- Beginning in or about 2006 or 2007, Detective-1 was in a sporadic sexual relationship with a woman ("Female-2"). In or about December 2014, Female-2 was arrested as part of a long-term investigation. Shortly after the arrest, a phone call between other targets of the investigations was intercepted in which the targets said to get the telephone number for Detective-1 and tell him that Female-2 had been arrested. Sometime after Female-2 was arrested, either Female-2 or a member of her family called Detective-1's phone and left a message that Female-2 had been arrested and asked Detective-1 to call back. Detective-1 queried Female-2 in NYPD computers to confirm that she had in fact been arrested. Thereafter, Detective-1 spoke on the phone and communicated by text with Female-2, as well as seeing her in person on approximately one occasion. An investigation was initiated into Detective-1, and Detective-1 was interviewed in connection with the investigation. During the interview, Detective-1 was truthful and admitted to his contacts with Female-2 and to querying her in the NYPD database. Detective-1 was charged by the NYPD with two violations of NYPD policy—one related to maintaining contact with Female-2 after becoming aware that she had been arrested and the other related to his use of the NYPD computer system to query Female-2, which was not connected to official business. Detective-1 lost 15 vacation days as a result.

## B. <u>Applicable Law</u>

The Federal Rules of Evidence limit the circumstances under which evidence of specific acts of a witness may be introduced into evidence. Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for

truthfulness."  The Court "may, on cross-examination, allow [those prior acts] to be inquired

into," but only if such acts "are probative of the character for truthfulness or untruthfulness

of . . . the witness."  Fed. R. Evid. 608(b)(1).  Any such cross-examination also must satisfy Rule

403—that is, specific instances of a witness's prior conduct may be inquired into on cross-

examination only if the probative value of such evidence is not substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury.  *See* Fed. R. Evid.

403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995).  In this context, evidence is

unfairly prejudicial if it would invite the jury to decide an issue material to the outcome of the

case for reasons that have nothing to do with the factual issues properly before the jury.  *See*

*United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

With respect to prior convictions, Rule 609(a)(1) provides that evidence of a witness's

prior felony conviction "must be admitted, subject to Rule 403."  *See United States v. Estrada*,

430 F.3d 606, 617 (2d Cir. 2005) ("Rule 609(a)(1) presumes that all felonies are at least

somewhat probative of a witness's propensity to testify truthfully.").  Pursuant to Rule 609(a)(2),

evidence of any conviction, regardless of whether it is a felony, is admissible if it involved a

crime of dishonesty or false statement.  *See* Fed. R. Evid. 609(a)(2) (evidence of a prior

conviction "must be admitted if the court can readily determine that establishing the elements of

the crime required proving—or the witness's admitting—a dishonest act or false statement").

However, Rule 609(b) places a time restriction on the admissibility of prior convictions: "[I]f

more than 10 years have passed since the witness's conviction or release from confinement for it,

whichever is later[,] [e]vidence of the conviction is admissible only if . . . its probative value,

supported by specific facts and circumstances, substantially outweighs its prejudicial effect."

Fed. R. Evid. 609(b).  In order to admit a conviction subject to Rule 609(b), a court must make

an "on-the-record determination supported by specific facts and circumstances that the probative value of the evidence substantially outweighs its prejudicial effect." *United States v. Mahler*, 579 F.2d 730, 736 (2d Cir. 1978).

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment." It is well settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted). As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted). "As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758,

763 (2d Cir. 1980)).

### C.  <u>Discussion</u>

The Government respectfully seeks an i*n limine* ruling precluding the defense from cross-examining CW-1, CW-2, CW-3, CW-4, CW-5, and Detective-1, regarding the matters described in Part I above.[4]  Any questioning on those matters would not be probative of the witnesses' truthfulness and would be unfairly prejudicial.

#### 1.  **CW-1 Child Endangerment; Domestic Disputes Involving CW-2, CW-3, CW-4, and CW-5; and CW-3's Sexual Harassment Conviction**

The defense should be precluded from cross-examining CW-1 regarding the prior child endangerment case; from cross-examining CW-2, CW-3, CW-4, and CW-5 regarding domestic disputes that resulted in no convictions; and from cross-examining CW-3 regarding the 2004 conviction for sexual harassment.  Courts in this Circuit have repeatedly barred cross-examination regarding violent conduct, including domestic acts, that has no bearing on a witness's credibility.  *See, e.g.*, *United States v. Jeffers*, 402 F. App'x 601, 603 (2d Cir. 2010) (affirming preclusion of cross-examination of cooperating witness regarding prior acts of domestic violence based on "determination that the purported prior acts of violence were not probative of [the witness's] credibility"); *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (affirming preclusion of cross-examination of cooperating witness regarding his role in a murder because the "murder was not relevant to [the witness's] credibility," and noting that "there was ample other material through which defendants could test his credibility and expose

---

[4] In a related trial that began on or about November 28, 2016, the Government previously moved before the Honorable William H. Pauley, III, to preclude cross on the matters related to CW-2 and Detective-1.  Judge Pauley granted the Government's motion with respect to CW-2, but denied the motion with respect to Detective-1.  The Government respectfully disagrees with Judge Pauley's ruling as to Detective-1 for the reasons set forth in the body of the Government's argument.

any bias"); *United States v. Fama*, 2012 WL 6094135, at *1 (E.D.N.Y. Dec. 7, 2012) (precluding cross-examination regarding prior acts of domestic violence because they "are not probative of [the witness's] credibility and do not indicate a lack of truthfulness"); *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003) (precluding cross-examination regarding witness's prior arrests for allegedly assaulting his girlfriend, finding that "they do not involve instances of dishonesty or making false statements," were unduly prejudicial, and noting "the Second Circuit's inclination to preclude the discussion of a witness's prior commission of violent crimes because of such crimes' lack of relevance to the issue of the witness's veracity").

Here, as in those cases, the domestic incidents, including allegations of child endangerment, and youthful sexual conduct did not involve dishonesty or deception, and they have no bearing on the credibility of the cooperating witnesses. Any questioning regarding these incidents involving child endangerment, domestic violence, and sexual contact would be inflammatory and unfairly prejudicial. Moreover, there is "ample other material" through which the cooperating witnesses can be cross-examined. The defense will be able to cross-examine CW-1 regarding, among other things, extensive drug dealing and drug use; CW-2, CW-3, and CW-5 regarding, among other things, extensive drug dealing, gun possession, and multiple acts of violence; and CW-4 regarding, among other things, drug dealing and gun possession. *See United States v. Laljie*, 184 F.3d 180, 192 (2d Cir. 1999) ("Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility.").

### 2. Detective-1 and CW-1

Similarly, the defense should be prohibited from cross-examining Detective-1 regarding the internal investigation related to his relationships with Female-2 and from cross-examining

CW-1 regarding past prostitution.

With respect to the conduct involving Detective-1, neither the NYPD investigation nor the underlying facts have any bearing on Detective-1's credibility as a witness. The violations of NYPD policy that Detective-1 admitted to committing are wholly unrelated to this case and concern his failure to adhere to workplace guidelines, not his character for truthfulness. *See United States v. Akefe*, 568 F. App'x 1, 8 (2d Cir. 2014) (preclusion of defense from cross-examining law enforcement officer regarding prior Office of Professional Responsibility investigation "was appropriate given that the allegations against [the agent] were wholly unrelated to the instant case and, in any event, found to be unsubstantiated"); *United States v. Lawes*, 292 F.3d 123, 131-32 (2d Cir. 2002) (affirming preclusion of cross-examination of police officer regarding CCRB finding that the officer had used excessive force in an unrelated incident, concluding that the "prior finding provides nothing of value with respect to [the officer's] motivation to lie" in the case at bar and would be a distraction to the jury); *United States v. Polanco*, 2011 WL 1795293, at *4 (S.D.N.Y. May 3, 2011) (precluding cross examination of NYPD officer regarding substantiated CCRB findings related to improper search and improper stop-and-frisk because "the CCRB findings at issue have no bearing on [the officer's] credibility"); *United States v. Laster*, 2007 WL 2872678, at *2 (S.D.N.Y. Sept. 28, 2007) (precluding defense from cross-examining police officer concerning allegations in CCRB complaint that officer failed to give proper medical attention to a suspect, finding that the allegations "do not bear on [the officer's] character for truthfulness").

Moreover, with respect to both CW-1 and Detective-1, the fact that the conduct about which the Government seeks to preclude cross-examination stems from a sexual relationship renders the conduct not just irrelevant, but prejudicial. As numerous courts have held, this fact

itself provides an independent basis for exclusion under Federal Rule of Evidence 403. *Agostini*, 280 F. Supp. 2d at 261 (noting that cross-examination on witness's prior arrest for domestic assault "has the potential for substantial prejudice," because it "may be viewed as reflecting poorly on [the witness's] character and influence the jury to a point of distraction from the matter about which he is called on to testify."); *cf. United States v. Rodriguez*, 648 F. App'x 9, 11 (2d Cir. 2016) (upholding preclusion of cross regarding sexual offenses); *United v. Reed*, 570 F. App'x 104, 108-09 (2d Cir. 2014) (same); *United States v. Calderon-Urbina*, 756 F. Supp. 2d 566 (S.D.N.Y. 2010) (holding that "evidence of [a confidential informant's] sex crimes is likely to be more prejudicial than probative, as well as inflammatory"); *United States v. Nosov*, 221 F. Supp. 2d 445, 450 (S.D.N.Y. 2002) (precluding cross on the pornographic nature of nature of films that witness wanted to produce because "assuming for the moment that the pornographic nature of the films did have some bearing on [the witness's] truthfulness, the value of such evidence would be outweighed, pursuant to Rule 403 . . . by the prejudicial impact that knowledge of the specific nature of these films would have on the jury"); *United States* v. *Devery*, 935 F. Supp. 393, 408 (S.D.N.Y. 1996) (holding that "[c]ross-examination concerning immoral acts and acts of sexual perversion may be properly excluded by a trial judge who determines they are not probative of the witness's veracity"). As the *Nosov* court remarked, "Given that fellow judges in this district have held that crimes such as rape and murder have little bearing on a witness' capacity for truthfulness, a ruling that [the witness's] scheme to produce pornographic films, itself not a crime, somehow reflected adversely upon his character for truthfulness would indeed be an anomaly." 221 F. Supp. 2d at 449. The same holds true here. Detective-1's sexual involvement with Female-2 and his related violations of NYPD policy do not adversely reflect on his credibility or his character for truthfulness. CW-1's

participation in prostitution decades ago is similarly irrelevant to an assessment of CW-1's reliability as a witness.

In sum, the NYPD investigation of Detective-1 and the underlying facts, and the facts of CW-1's decades-old prostitution activities are not appropriate topics of cross-examination; any such cross-examination would have no probative value and would be unfairly prejudicial.

**VI.   Conclusion**

For all of the foregoing reasons, the Government respectfully submits that the Court

should issue the orders requested by the Government in this application.

Dated:  New York, New York
        July 23, 2018

                              Respectfully submitted,


                              GEOFFREY S. BERMAN
                              United States Attorney


                    By:   _____/s/_____
                              Maurene Comey / Karin Portlock / Jacob Warren
                              Assistant United States Attorneys
                              Telephone: (212) 637-2324 / 1589 / 2264