UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>Lessage Jean Baptiste,<br><br>Defendant. | No. 1:15 CR 854 (SHS) |

**DEFENDANT LESSAGE JEAN BAPTISTE'S EMERGENCY MOTION
FOR RECONSIDERATION OF BAIL CONDITIONS**

Defendant, Lessage Jean Baptiste, moves the Court for an order, and a bail hearing if necessary, granting his release pending his disposition on motion to withdraw plea or sentencing hearing. As Your Honor is aware, Mr. Baptiste has been incarcerated since March 8, 2017, at the Metropolitan Correctional Center ("MCC"). The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Since Mr. Baptiste's last bail appeal hearing on July 2, 2018, the new coronavirus strain COVID-19 has spread rapidly across the world, through New York State, and within New York City.[1] At the MDC, Mr. Baptiste is at much graver risk of contracting this dangerous disease than if released to home confinement, and his detention at the MDC has become tantamount to a cruel and potentially health-threatening or life-threatening punishment.[2]

Mr. Baptiste is before this court on a presumptive case and additionally, has continued to pursue withdrawing his plea. Mr. Baptiste has previously sought release by Motion for Pretrial

---

[1] *E.g.*, *Coronavirus Map: Tracking the Spread of the Outbreak*, N.Y. Times (Mar. 12, 2020), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updating regularly).
[2] *See* Emily Bazelon, *Our Courts and Jails Are Putting Lives at Risk*, N.Y. Times (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html; Premal Dharia, *The Coronavirus Could Spark a Humanitarian Disaster in Jails and Prisons*, Slate (Mar. 11, 2020), https://slate.com/news-and-politics/2020/03/coronavirus-civil-rights-jails-and-prisons.html; Noah

Bail for Defendant Lessage Jean Baptiste filed on June 27, 2017 [Doc 212].

Hearings to facilitate motions have no certainty in light of the COVID-19 situation and the Chief Judge's recent order staying all civil and criminal trials until April 27, 2020. *See* Standing Order, *In re Coronavirus/Covid-19 Pandemic*, No. 20-misc-00154 (S.D.N.Y. Mar. 13, 2020) (C.J. McMahon) at ¶ 2 ("The Court may issue other orders concerning future continuances as necessary and appropriate."). The rescheduling of hearings, the new developments surrounding COVID-19, and MDC's cancellation of attorney visitation—necessitates Mr. Baptiste's release from custody. The defense requests that the Court order Mr. Baptiste's release and transfer to home confinement, in addition to any conditions the Court deems necessary and appropriate, and is prepared for a bail hearing if necessary. The Government and Probation do not consent to this request. If bail is not granted, defense counsel is now available for such a hearing the week of March 30, 2020, although as noted, it is highly questionable whether holding such a hearing (with the need for in person testimony) is advisable or safe.[3]

For the health of all involved, defense counsel further respectfully requests that any hearing on this emergency motion for reconsideration of bail conditions be conducted by telephone or video conferencing if at all possible. *See* Standing Order, *In re Coronavirus/Covid-19 Pandemic*, No. 20-misc-00154 (S.D.N.Y. Mar. 13, 2020) (C.J. McMahon) at ¶ 10. At such a hearing, the defense would waive Mr. Baptiste's presence for efficiency and speed, and to protect the safety of the attorneys, U.S. Probation, MCC personnel, and Court personnel. *See* Fed. R. Crim. P. 32.1(b)(1)(B); *see also* Fed. R. Crim. P. 43.

---

Goldberg, *NYC's Federal Jails Not Prepared for Coronavirus, Says Defense Attorney Group*, N.Y. Daily News (Mar. 9, 2020), https://www.nydailynews.com/coronavirus/ny-coronavirus-federal-jails-disease-unprepared-20200309-3wrmfwrh7zed7iene3ikyrxeze-story.html.

[3] Defense counsel questions whether it is safe for attorneys go to court, now or on March 25, 2020. Like most employees in New York City, defense counsel is currently working remotely. *See also* Marcia Coyle, *US Supreme Court Postpones Upcoming Arguments Amid Coronavirus Threat*, Law.com (Mar. 16, 2020), https://www.law.com/nationallawjournal/2020/03/16/us-supreme-court-postpones-upcoming-arguments-amid-coronavirus-threat/; *New York City to Close Schools, Restaurants and Bars*, N.Y. Times (Mar. 15, 2020), https://www.nytimes.com/2020/03/15/nyregion/new-york-coronavirus.html.

### I. The Bail Reform Act Requires Mr. Baptiste's Release.

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when Mr. Baptiste was ordered detained have changed. There is a pandemic that poses a direct risk to Mr. Baptiste that is far greater if he continues to be detained during this public health crisis. Additionally, there is no greater necessity for the preparation of a "person's defense" than access to counsel. The MCC's canceling of all social visits constitute "another compelling reason" for temporary release within the language of § 3142(i).

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial or VOSR hearing is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by- case" approach is required at any stage of the case in assessing the propriety of pretrial/prehearing detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

This Court should consider the "total harm and benefits to prisoner and society" that continued prehearing imprisonment of Mr. Baptiste will yield, relative to the heightened health risks posed to Mr. Baptiste during this rapidly encroaching pandemic. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

## II. Inmates Are at Heightened Risk of Contracting COVID-19.

Conditions of pretrial/prehearing confinement create the ideal environment for the transmission of contagious disease.[4] Inmates cycle in and out of the Federal Bureau of Prison ("BOP") pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[5] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," which means "infection control is challenging in these settings."[6] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009,

---

[4] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047 (Oct. 2007), https://doi.org/10.1086/521910.

[5] Laura M. Maruschak et al., U.S. Dep't of Just., Bureau of Just. Stat., *Medical Problems of State and Federal Prisoners and Jail Inmates*, 2011-12 (rev. Oct. 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[6] Letter, Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United

many jails and prisons dealt with high numbers of cases.[7] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[8] Even Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[9] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[10]

### III. Inmates Are at Heightened Risk of Contracting COVID-19.

Conditions of pretrial/prehearing confinement create the ideal environment for the transmission of contagious disease.[4] Inmates cycle in and out of the Federal Bureau of Prison ("BOP") pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[5] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," which means "infection control is challenging in these settings."[6] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[7] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[8] Even Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply

---

States (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[7] Nicole Wetsman, *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, Verge (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

[8] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Bus. Insider (Feb. 21, 2020), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[9] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[10]

### IV.   The MDC Is Failing to Protect Defendants From COVID-19.

The MDC has proven—recently and repeatedly in the past—that it is unable to protect the health and safety of defendants in its custody. The MCC is a massive pretrial detention facility, housing approximately 700 people. The majority of the people detained are housed in small two- man cells with a shared toilet and sink, and eat meals and have recreation in groups of 70 or more. Other units are open dormitories that house 70 or more inmates without the ability to separate. The medical care at both facilities has repeatedly failed to adequately address even routine medical conditions such as diabetes, pregnancy, and anemia.[11] In times of crisis, the medical care has halted entirely.

MDC demonstrated an inability to appropriately care for defendants just less than two weeks ago.

The MDC has not met even the most basic recommendations of the CDC for preventing the spread of the coronavirus.  It is still waiting for guidance from the BOP on screening and treatment. In the meantime, neither facility has a screening mechanism in place for staff, other than self- reporting. As of March 13, staff are not wearing face masks or gloves. The MDC does not have hand sanitizer available. MCC does not have any testing for COVID-19 available, and does not know when, if ever, it will have tests. There is no medical ward or facility in place at the MDC.

Reviewing the Metropolitan Detention Center's ("MDC") management of the 2019 "Polar Vortex" is instructive for evaluating how COVID-19 may unfold in BOP facilities. For an entire week in January and February 2019, during the sub-zero temperatures of the "Polar Vortex," MDC Brooklyn went without power and heat, and inmates were locked down for days at a time.[15] Inmates were denied hot food or additional blankets or warm clothing, despite the frigid air inside the facility. Inmates with serious pre-existing physical and mental illnesses received no

---

[13] *Id.*

[14] Per communications with the Federal Defenders of New York, defense counsel understands that on March 12, 2020, the Warden of the MCC advised that the MCC is seeking to order hand sanitizer, and that the BOP has relaxed its strictures on hand sanitizer during this period. The Warden had no information as to when hand sanitizer might arrive at the facility.

[15] *See* Annie Correal, *No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic,"* N.Y. Times (Feb. 1, 2019), https://www.nytimes.com/2019/02/01/nyregion/mdc-brooklyn-jail-heat.html; Complaint, *Scott v. Quay*, 19-CV-1075 (MKB), ECF No. 1 (E.D.N.Y. Feb. 22, 2019).

care.[16] Even the most basic efforts, such as moving inmates requiring sleep apnea machines to breathe to the available floors with electricity, were not taken.[17]

In granting downward sentencing variances in a series of cases after the blackout, Judge Chen noted that inmates at the MDC were "subjected to very cruel conditions," and that "there was a reluctance of the part of the officials [at MDC Brooklyn] to correct the conditions or even to disclose them timely."[18] Judge Furman reached the same conclusion: "It's pretty clear to me ... that steps could have been taken, and taken more quickly, to address the problems [at the MDC]. And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention should have to endure that as the detainees did at the MDC."[19]

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center (MDC) could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020).

---

[16] Complaint, *Scott v. Quay*, 19-CV-1075 (MKB), ECF No. 1 (E.D.N.Y. Feb. 22, 2019).

[17] Office of the Inspector Gen., U.S. Dep't of Just., *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, 29 (September 2019), https://oig.justice.gov/reports/2019/e1904.pdf.[18] Tr. of Sent. Hr'g. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC), ECF No. 16 (E.D.N.Y. Jun. 4, 2019); *see also United States v. Bruney*, 18-CR-542 (PKC) (E.D.N.Y. 2019); *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019).

[19] Tr. of Sent. Hr'g. at 31, *United States v. Ozols*, No. 16-CR-692 (JMF), ECF No. 234 (S.D.N.Y. Feb. 12, 2019).

### I. The Conditions at the MDC and the Postponement of Hearings Necessitate Mr. Baptiste's Release to Home Confinement Pending the Hearing.

Since Mr. Baptiste entered the MDC on March 8, 2017, conditions have deteriorated due to COVID-19. It is reported that inmates are restricted from showering, long delays for fresh underwear and no access to soap or hand sanitizer.

Moreover, Mr. Baptiste cannot adequately prepare his defense in either his current pursuit to withdraw his plea or prepare for sentencing in his case because on Friday, March 13, the BOP formally suspended all legal visits for 30 days due to COVID-19, with accommodations allowed only on a case-by-case basis.[20] While the BOP claims that confidential legal calls will be allowed, defense counsel is unconvinced that the MDC will implement measures such that Mr. Baptiste can receive the legal representation to which he is entitled.[21] Moreover, even if visits were permitted, counsel is hesitant to visit the MDC or have attorneys from counsel's law firm visit the MDC, given the significant health risk of the transmission and spread of COVID-19. Conditions at MDC are well documented even before the threat of COVID-19.

Mr. Baptiste expects that during his time on home confinement, he would in fact be supported and monitored by Probation and/or Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent

---

[20] Associated Press, *Visits Halted in Fed Prisons, Immigration Centers Over Virus*, N.Y. Times (Mar. 13, 2020), https://www.nytimes.com/aponline/2020/03/13/us/politics/ap-us-virus-outbreak-federal-prisons.html.

[21] Fed. Bureau of Prisons, U.S. Dep't. of Just., *Federal Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

[22] Sean Hecker (@hecker_sean), Twitter (Mar. 15, 2020, 6:20 PM), https://twitter.com/hecker_sean/status/1239320630853537792 (citing and attaching a March 15, 2020 letter from the Federal Defenders of New York to Chief Judges Katzmann, Mauskopf, and McMahon regarding COVID-19).

[23] Tom McParland, *Federal Defenders Protest Cutoff of Access to Clients Amid MCC Lockdown*, N.Y.L.J. (Mar. 3, 2020), https://www.law.com/newyorklawjournal/2020/03/03/federal-defenders-protest-cutoff-of-access-to-clients-amid-mcc-lockdown/.

[24] Fed. Bureau of Prisons, U.S. Dep't of Just., *Attorney's Guide to the Metropolitan Correctional Center* 10-11 (Apr. 2008), https://www.bop.gov/locations/institutions/nym/mcc_ny_attny_guide_april_2008.pdf.

crime while on release.[25] In the Eastern District of New York, Chief U.S. Pretrial Services Officer Roberto Cordeiro reports that in Fiscal Year 2019, only six of 1,300 defendants (0.5%) under Pretrial Services' supervision failed to appear in court; only 2.8% were rearrested. However, Mr. Baptiste submits that, if as the Government alleges, there are insufficiencies with Probation or Pretrial Service's supervision of its home confinement participants, Mr. Baptiste should not be further punished as a result of these departments' failures to operate its programs—and continued detention is indeed punitive and poses a significant danger to Mr. Baptiste's physical and mental health.

Mr. Baptiste has substantial community ties, he resides in the community and, he is not a risk of flight in this case and is absolutely desirous of fighting these charges.

If the Court has concerns about Mr. Baptiste's release defense counsel proposes any number of additional conditions previously submitted including $150,000 signature bonds co-signed by three financially secure persons, electronic ankle monitoring and intensive pre-trial supervision.

---

[25] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* 26 (Sept. 2018), https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

## II.     Conclusion

Our client is in grave danger. Mr. Baptiste is housed in unsanitary and inhumane conditions, with no ability to self-isolate or engage in even basic hygiene, much less assist in the preparation of his defense. These circumstances compel his release to home confinement. For the foregoing reasons, we respectfully move that Mr. Baptiste be released from custody to remain in home confinement until his hearing.

Dated: March 27, 2020                                                     Respectfully submitted,

                                                                                            BREEDING HENRY BAYSAN

                                                                                            By:  /s/ Bradley L. Henry

                                                                                            Bradley L. Henry
                                                                                            Breeding Henry Baysan PC
                                                                                            919 Third Avenue
                                                                                            New York, New York 10006
                                                                                            Telephone: (212) 891-1600
                                                                                            Facsimile: (865) 670-8536
                                                                                            bhenry@bhblegal.com
                                                                                            *Attorney for Lessage Jean Baptiste*

cc:     AUSA Geoffrey S. Berman (via ECF and email)
         AUSA Maurene Comey (via ECF and email)
         Probation Officer Jonathan J. Bressor (via ECF and email)