UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

LESSAGE JEAN BAPTISTE,

Defendant.

---

15-CR-00854 (SHS)

FINDINGS OF FACT &
CONCLUSIONS OF LAW

SIDNEY H. STEIN, U.S. District Judge.

Defendant Lessage Jean Baptiste pleaded guilty pursuant to a plea agreement to Count Six of superseding indictment S5 charging him with conspiring to distribute and possess with intent to distribute 280 grams or more of cocaine base, a detectable amount of heroin and a detectable amount of marijuana between 2008 and 2017. (ECF No. 300, at 20.)

Baptiste objected to the following Sentencing Guidelines calculations recommended in the resulting Presentence Investigation Report ("PSR") (ECF No. 312) and sought a *Fatico* hearing to challenge the factual findings by the Probation Department that underlay those calculations:

(i) that the defendant carried a firearm in connection with the narcotics conspiracy, and the resulting two-point enhancement that he agreed to in the plea agreement (PSR ¶¶ 14, 35, 47);

(ii) that, as a supplier of crack to other members of the conspiracy, he was a leader of the conspiracy, and the associated two-point enhancement that he agreed to in the plea agreement (PSR ¶¶ 14, 35, 49);

(iii) the drug quantity of between 280 and 840 grams of crack cocaine, resulting in a base offense level of 30 that he agreed to in the plea agreement (PSR ¶¶ 14, 35, 46); and

(iv) his participation in acts of violence, including the shooting and cutting of members of the rival Taylor Avenue Crew. (PSR ¶ 35.)

ECF No. 530, at 1 (citing PSR).

I. *FATICO* HEARING

On June 1, 2022, this Court conducted a *Fatico* hearing to resolve defendant's objections to the findings of fact and Guidelines calculations in the PSR. The Court heard testimony from Elijah Davila and Andrea Bell regarding defendant's participation in sales

of crack from 2008 to 2015 and heard testimony from Baptiste himself. The government also introduced several exhibits into evidence.[1]

## II. THE RELEVANT OFFENSE CONDUCT INVOLVED THE DISTRIBUTION OF AT LEAST 280 GRAMS OF CRACK

The Probation Department and the government contend that the relevant offense conduct involved the distribution of at least 280 grams of crack, which, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(c)(5), results in a base offense level of 30. The Court agrees with that position.

### A. Legal Standard

At the sentencing stage, the Government must establish disputed facts by a preponderance of the evidence. *United States v. Ruggiero*, 100 F.3d 284, 290 (2d Cir. 1996) ("[D]isputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence.") (quoting *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992.)) Moreover, "[a] district court may consider as part of its sentencing determination uncharged conduct proven by a preponderance of the evidence as long as that conduct does not increase either the statutory minimum or maximum available punishment." *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017).

Contrary to Baptiste's arguments that the Court at this sentencing stage must find the drug weight "beyond a reasonable doubt," drug weight only need be determined by a preponderance of the evidence. As set forth by the government, "the Supreme Court's decisions in *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] and *Alleyne v. United States*, 570 U.S. 99, 116 (2013) apply only to the elements of the charged offense, which were satisfied by the defendant's plea allocution." (Gov't Mem., at 2.) Neither decision is applicable to a Sentencing Guidelines provision at issue here, as none of the relevant provisions are an "essential element of the offense." *Cf. Apprendi*, 530 U.S. at 495 (2000) ("[M]erely because the state legislature placed its hate crime sentence 'enhancer' 'within the sentencing provisions' of the criminal code 'does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense.'") (citations omitted); *Alleyne*, 570 U.S. at 116 ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt.").

### B. Analysis

Having considered the evidence adduced during the *Fatico* hearing, as well as defendant's plea allocution (ECF No. 300), the Court finds that the government has proven

---

[1] Following the hearing, the government and defense filed memoranda in support of their respective positions. (Gov't Mem., ECF No. 538; Def. Mem., ECF No. 539) and Baptiste filed a pro se memorandum as well. (ECF No. 542.)

by a preponderance of the evidence that the relevant offense conduct involved the distribution of at least 280 grams of crack.

First, the defendant signed a plea agreement with the government in which he stipulated that the offense involved between 280 and 840 grams of crack cocaine. Am. PSR ¶14, ECF No. 504 (citing plea agreement). *See United States v. Granik*, 413 (2d Cir. 2004) ("[B]inding a defendant to factual stipulations regarding a crime requires only an understanding of the obvious: facts admitted in a plea agreement can, and usually will, be accepted by the sentencing court as true.").

Second, the defendant allocuted to involvement in the distribution of between 280 and 840 grams of crack cocaine in his plea allocution. (ECF No. 300, at 10.) The defendant was asked by the Court: "Do you understand that in Count Six, Mr. Jean Baptiste, you're charged with from 2008 until February of 2017 conspiring to distribute and possess with intent to distribute 280 grams and more of cocaine base, a detectable amount of heroin and a detectable amount of marijuana. Do you understand that?" (*Id.* at 10.) He replied "Yes." (*id.* at 10). After a thorough and detailed allocution, the Court accepted the defendant's plea of guilty to Count Six. (*Id.* at 21.)

Third, the defendant's own testimony at the June 1, 2022 *Fatico* hearing provides further evidence that Baptiste's offense involved in excess of 280 grams of crack cocaine. He testified under oath that he sold crack in 2014 and 2015 "all over the neighborhood, not just one specific spot. I sold on Taylor, Leland, I sold on Parkchester." (Tr. 139) He admitted to selling 30 grams in a "good month" (Tr. at 141) and during a bad month he would sell "maybe 10 grams" at a frequency of "[e]very probably week and a half, two weeks, sometimes three weeks." (Tr. 140.) Thus, even if Baptiste had merely two "good months"—and sold 60 grams during those two months—and then sold just 10 grams every two weeks in the remaining 22 months of the 2014 and 2015 period, Baptiste would have sold a total of 500 grams of crack. Thus, the government rightly notes that "[t]he defendant, by his own admission, personally sold at least 280 grams of crack." (Gov't Mem. at 5.)

Last, two witnesses at the *Fatico* hearing offered credible personal accounts implicating Baptiste in the distribution of more than 280 grams of crack cocaine. The Court credits the testimony of Elijah Davila that:

- in 2012, Davila saw Baptiste along with "Poppy, Storm, Maurice, Ali, Jah, Steve-O, and Mace" selling drugs on Beach Avenue (Tr. 34);

- Poppy and Jah told Davila that Baptiste was supplying them with crack cocaine in 2012; and

- from late 2012 through 2014—during the time periods in which Davila was not in custody—he saw Baptiste selling crack cocaine "almost every day, I'm gonna say every day . . . On Beach" and with other members of the Beach Avenue group. (Tr. 44.)

3

The Court also credits Andrea Bell's sworn testimony that:

- she sold crack for Baptiste from 2011 through her arrest in 2015 and that at the end of 2011 or during 2012, Baptiste moved from selling on Taylor Avenue to Beach Avenue (Tr. 77, 85);

- after Baptiste moved to Beach Avenue, Baptiste would provide Bell with both "double ups" and 15 bags of crack every day (Tr. 85), which each constituted approximately 1.5 to 2 grams of crack (Tr. 82-83);

- Baptiste taught Bell how to cook powdered cocaine into crack and that after Baptiste's move to Beach Avenue, Baptiste provided 20 grams of powdered cocaine twice a week to Bell (Tr. 85-87); and

- each time Bell would go to an apartment controlled by "Poppa" of the Beach Avenue Crew to obtain crack and powder cocaine, she observed "[a]bout a hundred grams" of cocaine. (Tr. 90.)

In sum, Baptiste's allocution and signed plea agreement stipulating to distributing more than 280 grams of crack cocaine are enough on their own for the Court to conclude, by a preponderance of the evidence, that the relevant offense conduct pertaining to Baptiste's involvement with the Beach Avenue Crew involved the distribution of at least 280 grams of crack cocaine.[2] The added *Fatico* hearing testimony of Davila and Bell, coupled with the defendant's own admissions during the hearing, offer further substantiation for the conclusion that Baptiste distributed more than 280 grams of crack cocaine in the course of the charged conspiracy.

The Court concludes that Baptiste's conduct involved the distribution of more than 280 grams of crack cocaine and therefore the base offense level is 30 under U.S.S.G. § 2D1.1(c)(5).

## III. THE DEFENDANT PLAYED A LEADERSHIP ROLE IN THE CHARGED NARCOTICS CONSPIRACY

Under U.S.S.G. § 3B1.1(c), a two-level offense enhancement applies if the Court finds that Baptiste was "an organizer, leader, manager, or supervisor in any criminal activity."

---

[2] Baptiste has argued that the Court must exclude from its drug quantity calculations any crack sold by Baptiste as part of a *different* conspiracy during the same 2008 – 2017 time frame that is outside the scope of Count Six. (Def. Mem., at 6-9.) The defendant notes that "there were multiple conspiracies over the range of time and in the broad geographic region specified in the indictment, and that the Court must find, beyond a reasonable doubt, which conspiracy is the one charged in Court Six and limit any estimate of the quantity of drugs to that particular conspiracy." (*Id.* at 7.) Because the Court finds that Baptiste was involved in distributing more than 280 grams of crack cocaine as a part of his involvement with the Beach Avenue Crew, the Court need not address Baptiste's argument that any crack sold on Taylor Avenue from 2008 to 2011 must be excluded from the drug quantity calculations.

A.  Legal Standard

The leadership enhancement applies in instances such as where a defendant: (i) managed just one other person, *United States v. Zichettello*, 208 F.3d 72, 107 (2000) (concluding that "[c]ontrary to [defendants'] contentions, they are subject to the enhancement even if they each managed only one other participant . . . "); (ii) "exercise[d] management responsibility over the property, assets, or activities of a criminal organization," U.S.S.G. cmt. n.2; or (iii) supplied drugs to another for that person to sell, set the price paid by the seller, and weighed and packaged the drugs, *United States v. Beaulieu*, 959 F.2d 375, 380 (2d Cir. 1992). Notably, the Government need not establish that Baptiste was the sole leader of the organization. *See* U.S.S.G. § 3B1.1 cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.")

B.  Analysis

The Court finds that any of the below pieces of evidence on their own are sufficient for the Court to conclude by a preponderance of the evidence that the two-level leadership enhancement applies.

First, the defendant stipulated to the leadership enhancement as part of the plea agreement, and confirmed during the plea allocution that he had read and understood the plea agreement and had discussed it with his lawyer before signing it. (ECF No. 300, at 15-16.)

Second, the Court credits Davila's testimony that he learned that by 2012 Baptiste was one of the two leaders of the Beach Avenue Crew selling crack cocaine on Beach Avenue and that a leader means that: "You the one that distribute the drugs and, you know, tell the rules of what's going on or anything like that within your organization." (Tr. 39.) Davila learned from conversations with "Jah and Poppy, Ali" that "they'd be waiting on getting work from Usher [i.e., Baptiste] or waiting from work from Mace." (Tr. 39.) The Court does not credit Baptiste's testimony to the contrary, where he claims that "there's no crew, there's no nothing. Everybody is freelancing." (Tr. 152.)

Third, the Court credits Bell's testimony that Baptiste determined which drugs to supply to Bell (crack versus powdered cocaine), taught Bell how to cook cocaine into crack, and for a 15 bag grouping of crack would have Bell pay $100 and allow Bell to keep $50 from each sale. (Tr. 82, 87.)

The Court finds that Baptiste was not simply an independent actor, but was rather "an organizer, leader, manager, or supervisor" of the Beach Avenue Crew that sold narcotics. The defendant took a hands-on role in managing the drug sales of several individuals, including Jah, Poppy, Ali, and Bell, as part of the narcotics conspiracy.

Consequently, the Court finds that Baptiste was "an organizer, leader, manager, or supervisor" in the Count Six narcotics conspiracy and that a two-point leadership enhancement applies under U.S.S.G. § 3B1.1(c).

## IV. THE DEFENDANT CARRIED A FIREARM IN CONNECTION WITH THE NARCOTICS CONSPIRACY

Under U.S.S.G. § 2D1.1(b)(1), a two-level offense enhancement applies if the Court finds that "a dangerous weapon (including a firearm) was possessed."

### A. Legal Standard

The Sentencing Guidelines define a dangerous weapon as "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1 cmt. n.1(E). As explained in the relevant application note, "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n.11. ("For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.").

### A. Analysis

The Court concludes by a preponderance of the evidence that "a dangerous weapon (including a firearm) was possessed," for each of the following four scenarios:

First, in his plea agreement Baptiste stipulated to the fact that a dangerous weapon (including a firearm) was possessed in connection with the charged offense. (ECF No. 504, at 6.) The Court does not find Baptiste's *Fatico* hearing testimony—that there were never guns around and that he never possessed a gun (Tr. 145)—to be credible.

Second, the Court credits Bell's answer of "[a] gun" to the question "[w]hat, if any, weapons had you seen Usher [i.e., Baptiste] possess as part of his drug sales?" (Tr. 77.) The Court also credits Bell's statements that Bell and Baptiste's girlfriend told Baptiste about Buddha's threat to shoot Baptiste's girlfriend and that Bell observed Baptiste first "grab his [two] guns" and then leave in a car. (Tr. 99-101.) The court does not credit Baptiste's testimony that he never had a dispute with Buddha. (Tr. 143.)

Because the Court credits Davila's testimony that Buddha was "one of the dudes from my crew" (i.e., the Taylor Avenue rival group), the Court finds that Baptiste's possession of a gun in the course of his dispute with Buddha constitutes possession of a dangerous weapon in connection with the narcotics conspiracy to which the defendant pleaded guilty.

Third, the Court finds that Baptiste personally shot at drug dealers from a rival organization. The Court credits Bell's testimony that Goonie and Gutta were drug sellers on

Taylor Avenue, (Tr. 97-97), and that Baptiste admitted to Bell that he shot them sometime between 2011 and 2012. (Tr. 98).

Fourth, the Court finds that Baptiste and co-conspirators possessed firearms to protect the Beach Avenue Crew's drug territory and that this possession was foreseeable by the defendant. The Court credits Bell's testimony that the defendant told Bell that "he [the defendant] need[ed] his guns, he's beefing" with others and therefore wouldn't sell a gun to Rigo. (Tr. 101).

In light of the foregoing findings that "a dangerous weapon (including a firearm) was possessed," the Court concludes that a two-level offense enhancement applies under U.S.S.G. § 2D1.1(b)(1).

## V. THE DEFENDANT PARTICIPATED IN MULTIPLE ACTS OF VIOLENCE

Baptiste's final objection is not over a Guidelines computation, but rather the Amended PSR's ¶35 that lists several acts of violence attributed to Baptiste. Upon due consideration, the Court finds that Baptiste's objections are unwarranted as there is a preponderance of the evidence that Baptiste engaged in the violent incidents described in Amended PSR ¶35: First, the Court credits Davila's testimony that he saw Buddha immediately after Buddha was stabbed and that Buddha told him that Baptiste was the attacker. (Tr. 24.) This was also corroborated by Bell's testimony (Tr. 100.) Second, the Court credits Davila's testimony that Baptiste attacked him with a two-by-four plank with exposed nails. (Tr. 25-26.) Third, the Court credits Bell's statement that Baptiste "told me about the – when he shot out Goonie and Gutta car windows," which occurred in "approximately like 2011." (Tr. 77, 97.)

## VI. CONCLUSION

The government has met its burden to establish the following contested facts by a preponderance of the evidence, including through testimony at the June 1, 2022 *Fatico* hearing:

> (i) the relevant offense conduct involved the distribution of at least 280 grams of crack, resulting in a base offense level of 30 under U.S.S.G. § 2D1.1(c)(5);
>
> (ii) the defendant was "an organizer, leader, manager, or supervisor" of the drug conspiracy, resulting in a two-point leadership enhancement under U.S.S.G. § 3B1.1(c);
>
> (iii) "a dangerous weapon (including a firearm) was possessed" in the course of the defendant's offense conduct, resulting in a two-level offense enhancement under U.S.S.G. § 2D1.1(b)(1); and

   (iv) the defendant engaged in the acts of violence described in the Amended PSR's ¶35, thus leading the Court to adopt those acts of violence as true for purposes of sentencing.

Dated: New York, New York
   July 11, 2022

         SO ORDERED:

         _____
         Sidney H. Stein, U.S.D.J.